***********
This matter was reviewed by the Full Commission based upon the record of the proceedings before Deputy Commissioner Rowell, along with the briefs and arguments on appeal. The appealing party has shown good ground to amend the prior Opinion and Award. Accordingly, the Full Commission MODIFIES the Deputy Commissioner's holding and enters the following Opinion and Award.
 ***********
The Full Commission finds as fact and concludes as matters of law the following, which were entered into by the parties at the hearing before the Deputy Commissioner and in a Pre-Trial Agreement as
 STIPULATIONS
1. The parties are subject to and bound by the provisions of the Workers' Compensantion Act.
2. The employer-employee relationship existed between plaintiff and defendant-employer on October 26, 2000.
3. Pharmacists Mutual Insurance Company is the compensation carrier on the risk.
4. The date of alleged injury is October 26, 2000.
5. The parties also agreed to stipulate to the following documents:
a. I.C. Forms 18, 22, 61, 33, and 33R — but Forms 18, 61, 33, and 33R are stipulated only to the following extent: to show what the parties have put forth and/or contended. The truth and substantive content of those contentions (especially the ones in dispute) are not stipulated.
b. Division of Motor Vehicles Accident Report.
c. Plaintiff's medical records, subject to the right of either party to depose any medical provider with 60 days of the date of hearing. All health care provider records identified herein are admitted into evidence without further proof, but subject to the qualifications set forth in the following sentence. To the extent that the author of any such document or the source for any communication within any such document testifies in a manner which contravenes, disavows, renounces, repudiates, abandons, and/or contradicts any recitation in that document or attributed to such source, then such contravened, etc., recitations in such documents are not stipulated into evidence and there is no stipulation as to the admissibility of those recitations.
6. The parties have reserved the right to submit further proposed conclusively binding stipulations in this case, which stipulations may be entered into at a later point during the proceedings in this case.
7. Any version(s) of the Pretrial Agreement bearing transmitted-by-fax signatures as opposed to original in-ink signature(s) shall be as fully binding, valid, and effective as the version(s) bearing original in-ink signatures(s) and the attorneys signing this Pretrial Agreement hereby authorize and request that the Industrial Commission treat any transmitted-by-fax signature(s) as being as valid, binding, and effective as the version(s) bearing the original in-ink signature(s).
8. The parties stipulate into evidence as Stipulated Exhibit #1, the Pre-trial Agreement.
9. The parties stipulate into evidence as Stipulated Exhibit #2, plaintiff's medical records.
10. The parties stipulate into evidence as Stipulated Exhibit #3, DMV accident report.
11. The parties stipulate into evidence as Stipulated Exhibit #4, Industrial Commission Forms as follows: Form 18, filed February 7, 2001, Form 61, dated February 26, 2001, Form33, dated March 7, 2001, and Form 33R, dated April 16, 2001.
 ***********
Based upon all of the competent evidence in the record, the Industrial Commission makes the following:
 FINDINGS OF FACT
1. At the time of the hearing before the Deputy Commissioner, plaintiff was 27 years old. Plaintiff had completed high school. After graduating high school, she attended Robinson Tech earning her CNA (Certified Nursing Assistant) Certification. At the time of the hearing before the Deputy Commissioner, plaintiff was enrolled at Robinson Tech pursuing her RN degree.
2. Defendant-employer is a home health care agency that employs CNAs to travel to patients' homes to provide nursing services and perform household chores. Plaintiff was hired to work for defendant-employer on October 28, 1999, as a CNA.
3. It was a prerequisite of plaintiff's employment with defendant-employer that she have her own means of reliable transportation to drive to the patients' homes. Defendant-employer did not provide vehicles for its employees. Defendant-employer did, however, provide a travel allowance in the form of mileage reimbursement at the rate of 29 cents per mile.
4. When plaintiff first went to work for defendant-employer in 1999, she worked as a CNA assigned to only one patient. However, soon thereafter she became a "designated runner," which meant that she worked for multiple patients each day. As a designated runner, plaintiff was reimbursed for mileage incurred from her home to her first patient, from one patient's home to the next, and then from her last patient to her own home at the end of the day. Plaintiff was not required to go to defendant — employer's office at the beginning and end of each workday.
5. As a designated runner, plaintiff covered all of Robeson County, and would sometimes have to drive thirty to forty miles between patients' homes. Defendant-employer considered plaintiff "on duty" when she traveled from one patient's home to the next, but she was not paid wages for the time she spent driving. The only payment plaintiff would receive from driving to the homes of defendant-employer's clients was the mileage reimbursement.
6. Many of defendant-employer's clients are covered by Medicaid. Medicaid has strict billing rules, and defendant-employer could risk losing a lot of business if billing irregularities were found. Because of this, and to avoid having any of its employees accused of theft, defendant-employer had an established policy that its employees were not to remain at a patient's home if the patient left.
7. When plaintiff first encountered a situation involving a patient who was going to leave the home, she called Barbara Locklear, defendant-employer's scheduling supervisor, and asked her what to do. Ms. Locklear told plaintiff that she had to leave the premises, but if the patient was going to be right back, plaintiff should go get something to eat or do something else until the patient returned. However, if the patient were going to be gone more than an hour or two, plaintiff would have to go on to another patient, and should therefore call the office to get another assignment.
8. On October 26, 2000, plaintiff had her first appointment at the home of Linda Galegos. Plaintiff was to report to the Galegos home at 8:00 a.m. and work 3.5 hours. When plaintiff arrived, Ms. Galegos was leaving her home to go take care of some business at school. Ms. Galegos told plaintiff that she would be back home in approximately twenty minutes, and that plaintiff could stay there and wait in her home. Plaintiff told Ms. Galegos that plaintiff, pursuant to defendant-employer policy, could not stay on a patient's property while plaintiff was not present, and that plaintiff would have to leave and go do something while the patient was away. Plaintiff told Ms. Galegos that they would meet back at the patient's home.
9. Defendant-employer had no written policies or rules that addressed this situation. On October 26, 2000, plaintiff believed that she was complying with defendant-employer's policies when she left Ms. Galegos' home. Her supervisor, Ms. Locklear, had told plaintiff that, when faced with this situation, if the patient was going to be back soon, then the plaintiff should go get something to eat or do something else until the patient returned. Plaintiff understood that Ms. Galegos would be back in approximately twenty minutes.
10. After Ms. Galegos left her home for the school, plaintiff drove to her father's place of employment to give him his wallet. This was approximately 11 miles from the Galegos home. Plaintiff took the most direct route to deliver the wallet. She then turned around and commenced taking the most direct route to the home of Ms. Galegos. In route back to the Galegos home, plaintiff ran off the road and hit a church. She was taken by ambulance to the hospital, where she was diagnosed with multiple injuries, including a right comminuted calcaneal fracture. Plaintiff reported to her medical providers that she thought she had blacked out before she ran off the road.
11. Following the injury, plaintiff came under the care of Dr. George Dawson, III, in Florence, South Carolina. Dr. Dawson recommended conservative treatment, which involved the application of a soft cast and the use of crutches for several months. As a result of the right comminuted calcaneal fracture, plaintiff was not able to walk without crutches or return to work as a CNA until April 9, 2001. Dr. Dawson released plaintiff to return to full duty as a home health care nurse on April 9, 2001.
12. Prior to April 9, 2001, plaintiff contacted defendant-employer to request sedentary work. Plaintiff was told there was no light duty work available. Plaintiff's employment with defendant-employer was not terminated, and she returned to work for defendant-employer in April 2001 earning the same wages she was earning at the time of the injury.
13. Plaintiff was on crutches through March 2001. Her prior work experience was limited to jobs which would have required her to work on her feet. She did not look for sedentary work between October 26, 2000 and April 9, 2001, because she was still an employee of defendant-employer. It would have been futile in any event for her to have looked for sedentary work, given her restrictions and her past work experience.
14. Plaintiff's October 26, 2000 injury was a natural result of one of the risks of her employment, which required driving every day to patients' homes.
15. Plaintiff's injury did not arise solely from an idiopathic cause.
16. While plaintiff's October 26, 2000 motor vehicle accident may have been precipitated by an idiopathic cause, driving a car for defendants placed plaintiff in a position that increased her risk of injury when and if the idiopathic condition became symptomatic.
17. Plaintiff's October 26, 2000 injury arose out of both her idiopathic condition and the hazards incident to her employment with defendant-employer.
18. Plaintiff was complying with defendant-employer's policies when she left the Galegos home on October 26, 2000. By planning to return to provide Galegos coverage on October 26, 2000, plaintiff was benefiting defendant-employer by helping one of its clients.
19. While plaintiff may have been on a personal mission when she took her father's wallet to him on October 26, 2000, at the time her injury occurred she had completed her personal mission and had returned to the service of her employer. Furthermore, plaintiff had struck out on this personal mission because she was required to by defendant-employer policy.
20. On October 26, 2000, plaintiff sustained an injury by accident arising out of and in the course of her employment with defendant-employer.
21. As a result of the injury she sustained on October 26, 2000, plaintiff was unable to earn the same wages she was earning at the time of the injury in the same or any other employment, from October 26, 2000 to April 9, 2001.
22. As a result of the injury of October 26, 2000, plaintiff retains a 30% (thirty percent) permanent disability to her right foot.
23. Immediately after the October 26, 2000 injury, Dr. Dacjzak recommended surgery. Plaintiff elected to pursue conservative treatment instead with Dr. Dawson. The medical treatment rendered by Dr. Dawson was reasonable and necessary to effect a cure, give relief and lessen the period of disability arising out of the October 26, 2000 injury. The last x-rays taken by Dr. Dawson showed considerable disruption of the subtalar joint. Plaintiff has not as of yet elected to undergo a subtalar fusion, but she is at significant risk of requiring a subtalar fusion in the future.
24. Plaintiff's father reported the injury to defendant-employer on the date of injury. Defendant-employer had actual notice of the injury on the date it occurred, as evidenced by defendant-employer's own written incident report. Under these circumstances, plaintiff had no reason to believe she had to follow-up with a written report of injury. Plaintiff has offered reasonable excuse for failing to give written notice of the injury within 30 days. Defendants offered no evidence that might tend to show that they were prejudiced by plaintiff's failure to file a written report within thirty days of the injury.
25. Plaintiff's average weekly wage cannot be determined based upon the Form 22 wage chart alone, because it does not reflect what plaintiff was paid for mileage. Plaintiff's mileage reimbursement must be included in the calculation of her average weekly wage because she was paid mileage in lieu of wages.
 ***********
Based upon the foregoing findings of fact, the Full Commission concludes as follows:
 CONCLUSIONS OF LAW
1. On October 26, 2000, plaintiff's employment with defendant-employer required that she have her own means of reliable transportation to drive to the patients' homes. Plaintiff's employment with defendant-employer required daily travel, thereby exposing her to the hazards of vehicular travel. Plaintiff's employment with defendant-employer placed her in a position that increased her risk of having an injury from a motor vehicular accident. Pittman v. Twin City Laundry Cleaners,61 N.C. App. 468, 300 S.E.2d 899 (1983).
2. The case at hand is distinguishable from Jacobs v. Sara LeeCorp. (No. COA02-413; filed 1 April 2003) because the plaintiff in case at hand (unlike the Jacobs plaintiff) was required to divert off the patient's property, whether the plaintiff wished to or not. This diversion policy furthered the defendant-employer's business because, in defendant-employer's opinion, it better complied with Medicaid billing requirements and lessened defendant-employer's potential theft liability. Furthermore, unlike the Jacobs facts, in the case at hand the plaintiff had returned from the diversion and was on a business route when injured.
3. On October 26, 2000, plaintiff sustained injuries while in a motor vehicle accident. At the time of plaintiff's motor vehicle accident she had completed her required diversion and was returning on a direct route to her patient's home. At the time of plaintiff's motor vehicle accident, she had resumed a direct business route and was about the business of her employment.Martin v. Georgia-Pacific Corp., 5 N.C. App. 37, 167 S.E.2d 790
(1969).
4. The injuries plaintiff sustained in her motor vehicle accident on October 26, 2000 resulted from her idiopathic condition combined with the hazards of the driving required by her employment with defendant-employer. Hollar v. MontclairFurniture Co., Inc., 48 N.C. App. 489, 269 S.E.2d 667 (1980).
5. On October 26, 2000, plaintiff sustained an injury by accident arising out of and in the course of her employment with defendant-employer. N.C. Gen. Stat. § 97-2(6).
6. As a result of the injury of October 26, 2000, plaintiff was temporarily and totally disabled from the date of injury to April 9, 2001. N.C. Gen. Stat. § 97-29.
7. As a result of the injury of October 26, 2000, plaintiff remains at 30% (thirty percent) permanent disability to her right foot, which entitles her to benefits under N.C. Gen. Stat. §97-31(14) for a period of 43.2 weeks.
8. The medical treatment plaintiff has received to date has been reasonable and necessary to effect a cure, give relief, and lessen the period of plaintiff's disability. Defendants are liable for the expenses plaintiff incurred for this treatment. Plaintiff is entitled to have defendants provide all medical treatment necessitated by her October 26, 2000 compensable injury, including all treatment recommended by Dr. Dawson, including subtallar fusion surgery, should it become necessary. N.C. Gen. Stat. § 97-25.
9. Plaintiff's average weekly wage cannot be determined based upon the Form 22 wage chart alone. The evidence of record tended to show that in addition to her hourly wages, plaintiff was paid mileage reimbursement in lieu of wages. The amounts plaintiff was paid in mileage reimbursement over the 52-week period prior to the date of injury must be included in the calculation of the average weekly wage. N.C. Gen. Stat. § 97-2(5).
 ***********
Based upon the foregoing findings of fact and conclusions of law, the Full Commission enters the following:
 ORDER
1. Defendants are hereby ordered to pay temporary total disability benefits and permanent partial disability benefits, for the period from October 26, 2000 to April 9, 2001, and for an additional 43.2 weeks thereafter, at a rate that includes plaintiff's wages, and, in addition, considers all travel expenses paid to plaintiff during the 52-week period prior to the date of injury. The parties should attempt to agree on a compensation rate given this ruling. Should the parties be unable to arrive at a figure, this panel should be contacted for a ruling.
2. Defendants shall pay all medical expenses incurred or to be incurred by plaintiff as a result of her compensable injury so long as it tends to effect a cure and give relief or lessen plaintiff's disability. These medical expenses shall include continuing treatment of plaintiff as recommended by Dr. Dawson, including subtallar fusion surgery, should it become necessary.
3. An attorney fee of 25% of the compensation awarded herein is hereby approved for plaintiff's counsel. This amount shall be deducted from the lump sum due plaintiff and paid directly to plaintiff's attorney.
4. Defendants shall pay the costs of this appeal.
 S/_______________ CHRISTOPHER SCOTT COMMISSIONER
CONCURRING:
 S/______________________ LAURA KRANIFELD MAVRETIC COMMISSIONER
 S/___________________ BERNADINE S. BALLANCE COMMISSIONER